IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GLENEAGLES DEVELOPMENT PTE LTD | § | |
| and CONTINENTAL HOSPITALS | § | |
| PRIVATE LIMITED, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:17-cv-03138 |
| | § | |
| THOTA GURUNATH REDDY, | § | |
| | § | |
| Defendant. | § | |

## BRIEF IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER

While the dispute between these parties is complex, the issue before this Court is exceedingly simple.  Defendant Thota Gurunath Reddy ("Defendant") and Plaintiffs Gleneagles Development Pte Ltd ("Gleneagles") and Continental Hospitals Private Limited ("Continental," and collectively with Gleneagles, "Plaintiffs") agreed unambiguously and without exception that they would submit all disputes arising out of their joint investment in an Indian hospital to binding international arbitration.

When a dispute arose, Plaintiffs did just that by filing arbitration with the Singapore International Arbitration Center in accordance with the terms of the Shareholders Agreement between the parties (the "Arbitration" and the "SHA").  Defendant, however, refused to respect the Arbitration and has taken numerous steps to frustrate and delay the proceedings.  These include, most egregiously, the initiation of two separate legal actions in India raising issues that are all squarely within the scope of the arbitration clause of the SHA and undermine its effectiveness.  In the first of these two Indian lawsuits the Indian court has already ruled that the

disputes are within the scope of the arbitration clause and dismissed the action.  This harassing and vexatious litigation must be stopped.

This Court has the power to do so.  Because this Court has personal jurisdiction over Defendant, it can issue injunctive relief ordering him to cease his foreign lawsuits that interfere with the Arbitration.[1]  Courts have routinely enjoined foreign litigation in situations similar to here where the foreign litigation "result[s] in 'inequitable hardship' and 'tend[s] to frustrate and delay the speedy and efficient determination of the cause.'"  *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 627 (5th Cir. 1996) (quoting *In re Unterweser Reederei*, 428 F.2d 888, 890, 896 (5th Cir. 1970)).  In light of the strong presumption in favor of arbitration, this rule is even more powerful where, as here, the parties have agreed to arbitrate the disputes raised in the foreign proceeding.  *See, e.g.*, *Storm LLC v. Telenor Mobile Communs. AS*, 2006 U.S. Dist. LEXIS 90978, at *26 (S.D.N.Y. Dec. 18, 2006) (granting anti-suit injunction and observing that when a foreign proceeding "[a]ttempts to interfere with arbitration of international disputes . . . little else is required to authorize an injunction.").

As set forth herein, the foreign actions filed by Defendant are vexatious, duplicative, and serve only to delay adjudication of the dispute on the merits in the agreed upon arbitral forum. Accordingly, this Court should exercise its broad discretion to issue an anti-suit injunction ordering Defendant to put an end to this gamesmanship and allow the parties to resolve their disputes through the pending Arbitration as contractually agreed.

---

[1] The SHA delegates decision-making power on behalf of the other Minority Shareholders to Defendant.  *See* SHA § 21.11. Thus, an injunction against Defendant will effectively end this meritless foreign litigation campaign in its entirety, notwithstanding that the other Minority Shareholders are not subject to the jurisdiction of this Court.

## FACTUAL BACKGROUND

The dispute giving rise to the Arbitration and the vexatious Indian litigation centers around the operation and ownership by Continental of a 350 bed hospital in Hyderabad, India. Krishnan Decl. ¶ 3.   The hospital opened in 2013 and currently serves more than 150,000 patients per year with a broad range of services.   Id.   Plaintiffs and Defendant have been co-shareholders in Continental since they entered a series of agreements, including principally the SHA, on February 18, 2015.  Id. ¶ 4 & Exh. A.  Through these agreements, Gleneagles acquired a 51% stake in Continental from a group of then-existing shareholders that included Defendant and others (collectively, the "Minority Shareholders").   Id. ¶ 4.   After this transaction, the Minority Shareholders retained 49% of the shares of Continental, two of them remained directors of Continental, and Defendant remained Continental's Chairman of the Board and a strategic consultant to the hospital.  Id. ¶ 4–5.

Importantly, the SHA contained a broad arbitration and dispute resolution clause.  That clause covers "any dispute or claim ("Dispute") of whatever nature arising under, out of or between the Parties, in connection with or relating to the enforcement, interpretation or performance of the terms and conditions of this Agreement, or any provision thereof, including any purported termination or invalidity hereof, or the breach… ."  SHA § 19.2.  In addition to requiring pre-filing notification and discussions, it further provided that "[i]f the Dispute is not resolved through such discussions within thirty (30) Business Days of the Dispute having arisen, then such Dispute shall be referred to and resolved in accordance with the Singapore International Arbitration Centre Rules."  SHA § 19.3.  To effectuate these clauses, the parties also agreed in the SHA that "[e]ach Party shall co-operate in good faith to expedite (to the maximum extent practicable) the conduct of any arbitral proceedings commenced under this

Agreement." SHA § 19.4.   Defendant's disregard for these clauses is the foundation of this action.

Continental experienced financial difficulties before the investment by Gleneagles. Krishnan Decl. ¶ 6.  Unfortunately, those difficulties grew after Gleneagles' share purchase.  Id. Continental therefore sought additional funding in late 2016 to avoid a declaration that its loans were non-performing assets.  Id. ¶ 7–8.  Because Continental's outstanding debt violated certain covenants in the SHA, it could not obtain third-party funding.  Id. ¶ 7.  Continental's Board therefore approved a Rights Issue in late 2016 as contemplated by the SHA to raise additional capital from the existing shareholders on a pro rata basis (the "2016 Rights Issue").  Id. ¶ 9. Gleneagles accepted the 2016 Rights Issue and purchased the additional shares offered.  Id. ¶ 10. Defendant and the other Minority Shareholders did not.  Id. ¶ 10.

Defendant and the other Minority Shareholders unjustifiably resisted the 2016 Rights Issue, including by sending a Notice of Dispute under the SHA's dispute resolution clause.  Id. ¶ 11 & Exh. B.  Continental replied to this Notice of Dispute just a week later, rejecting the allegations, offering several suggestions to resolve the dispute, and acknowledging the application of the dispute resolution clause of the SHA.  Defendant and the other Minority Shareholders did not reply.  Instead, in violation of the arbitration requirement in the very dispute resolution clause they had just invoked, Defendant and the other Minority Shareholders then filed a meritless petition against Plaintiffs in the National Company Law Tribunal in Hyderabad, India on November 25, 2016 seeking, *inter alia*, a stay of an upcoming Continental board meeting at which critical resolutions regarding the 2016 Rights Issue and related funding were to be passed (the "NCLT Petition"). Singh Decl. ¶ 3 & Exh. A.

Thus began a series of actions by Defendant and the other Minority Shareholders to frustrate the 2016 Rights Issue and a subsequent capital call (the "2017 Rights Issue") and otherwise harm Continental.[2]  Id. ¶ 8.  Because these actions were in breach of the SHA and threatened to cause grave harm to Continental, Plaintiffs issued a Notice of Dispute pursuant to Section 19 of the SHA on December 8, 2016.  Krishnan Decl. ¶ 17.

Defendant and the other Minority Shareholders did not cure their breaches.  To the contrary, they continued to impede the operations of Continental.  As a result, Plaintiffs initiated arbitration under the SHA with the Singapore International Arbitration Centre ("SIAC") on January 27, 2017, asserting numerous breaches of the SHA by Defendant and the other Minority Shareholders, and supplemented those claims on March 14, 2017 (defined above as the "Arbitration").[3]  Goyal Decl. ¶ 3 & Exh. A, B.

Defendant and the other Minority Shareholders have repeatedly obstructed the progress of the Arbitration.  Specifically, Defendant and the other Minority Shareholders unreasonably delayed in providing the details of their party-appointed arbitrator to the SIAC.  Id. ¶ 4.  Moreover, Defendant and the other Minority Shareholders filed a meritless challenge to the appointment of Plaintiffs' party-appointed arbitrator.  Id. ¶ 4.  This led to the suspension of the Arbitration pursuant to SIAC Rule 15.4 and the failure to appoint the third member of the

---

[2] For the avoidance of doubt, Plaintiffs do not seek redress for these specific breaches in this action, despite their description in the Complaint which was intended for background purposes. Instead, Plaintiffs merely seek this Court's assistance in ensuring the meaningfulness of the arbitration to which the parties' expressly agreed in the SHA.  Plaintiffs expressly reserve any and all rights to seek redress for all breaches of the SHA, any other agreement, or any other violation of law in any appropriate forum.

[3] A true and correct copy of Plaintiffs' January 27, 2017 Notice of Arbitration is attached as **Exhibit A** to the Declaration of Ankit Goyal filed concurrently with this Complaint.  A true and correct copy of Plaintiffs' March 14, 2017 Notice of Arbitration is attached as **Exhibit B** to the Declaration of Ankit Goyal filed concurrently with this Complaint.

arbitration tribunal.  Id. ¶ 5.  This has already caused a delay of at least two months in the constitution of the arbitral Tribunal.  Id.¶ 5.  That delay grows longer every day.

While the 2016 Rights Issue was belatedly completed, Defendant's actions have prevented the completion of the subsequent 2017 Rights Issue which is needed to provide additional, much needed funding to Continental.  Singh Decl. ¶ 11.  In this regard, Defendant and the other Minority Shareholders filed a civil lawsuit in an Indian District Court September 18, 2017 seeking to restrain Continental from consummating the 2017 Rights Issue (the "Civil Lawsuit"). [4]  Id. ¶ 8 & Exh. B.  Defendant and the other Minority Shareholders obtained an *ex parte* injunction preventing the capital call upon filing this Civil Lawsuit.  Id. ¶ 10.  Notably, this injunction was obtained as a result of Defendant's failure to disclose in the Civil Lawsuit that (i) the SHA contained an arbitration clause covering this dispute; and (ii) the NCLT had previously dismissed the NCLT Petition raising similar issues and compelled the dispute to arbitration (as discussed below).  Id. ¶ 9.  While the injunction from the Civil Lawsuit was recently dissolved, the 2017 Rights Issue has still not been consummated as a result of Defendant's actions. Krishnan Decl. ¶ 11, 18.  Moreover, Defendant's past behavior suggests that there is a likelihood that Defendant and the other Minority Shareholders may seek further relief in the pending Civil Lawsuit or in another Indian lawsuit if not enjoined from doing so.

All of the issues raised by Defendant and the other Minority Shareholders in the NCLT Petition and the Civil Lawsuit are within the scope of the arbitration clause in the SHA and therefore must be litigated exclusively in the Arbitration.  Specifically, all of these claims relate to the provisions for capital calls set forth in Section 7 of the SHA, a subject squarely within the four corners of the arbitration agreement.

---

[4] A true and correct copy of the Complaint in the Civil Action is attached as **Exhibit B** to the Declaration of Vijayendra Pratap Singh filed concurrently with this Complaint.

Indeed, the NCLT dismissed the NCLT Petition after finding that the claims raised by Defendant and the other Minority Shareholders therein are within the scope of the arbitration clause in the SHA.[5]  Singh Decl. ¶ 4–5 & Exh. A.  In so doing, the NCLT was explicit:

> In light of the above facts and circumstances of the case and law as discussed above, we are of the considered view that **the main issues raised in the Company petition [filed by Defendant and the other Minority Shareholders] arises primarily out of SHA dated 18th February 2015 which contains a valid arbitration clause** as discussed supra and all the remaining issues are either consequential/related/trivial issues, which are not required to be considered by this Tribunal and they would entirely depend upon adjudication of main issues arises out of alleged violations of clauses of SHA.  **As there is a valid, enforceable, undisputed SHA dated 18th February 2015 un-disputably exist between the parties, where an arbitration clause is available, it is mandatory for this Tribunal to refer the parties to Arbitration under SIAC Rules**, and the parties are at liberty to file final claims/please before Singapore Arbitration Tribunal.

Singh Decl. ¶ 6 & Ex. A ¶ 23 (emphasis added).

Defendant's and the other Minority Shareholders' actions in the NCLT Petition and the Civil Lawsuit have frustrated the Arbitration and harmed Plaintiffs in multiple ways.  First, Defendant and the Minority shareholders seek relief from the Indian courts that is duplicative of the issues in the Arbitration.  Second, Plaintiffs have been forced to defend these lawsuits in Indian courts, despite the unambiguous agreement to arbitrate all disputes.  This has caused additional and unjustified expense to Plaintiffs and distraction from the merits of the Arbitration.  Moreover, continuation of the Civil Lawsuit[6] risks further harm to the Arbitration through continued distraction, expense, and potential future injunctive relief from the Indian courts.

---

[5] A true and correct copy of the Order from the NCLT dated April 20, 2017 is attached as **Exhibit A** to the Declaration of Vijayendra Pratap Singh filed concurrently with this Complaint.
[6] Plaintiffs do not at this time seek to enjoin the NCLT Petition because that Indian Action has been dismissed in its entirety, subject to an appeal by Defendant.  Plaintiffs reserve all rights to seek injunctive relief related to the NCLT petition if and when the need arises.

Moreover, the Civil Lawsuit specifically has led to delay in consummating the capital call that it critical to the survival of Continental.  Continued prosecution of this meritless lawsuit may lead to the designation of Continental as a "non-performing asset" by its lenders, as per the criteria specified by the Federal Reserve Bank of India, triggering severe consequences under Indian law.  Krishnan Decl. ¶ 19; Singh Decl. ¶ 12.  If the Civil Lawsuit and other Indian proceedings are allowed to continue, there is a very real risk that Defendant will take further actions to frustrate the much needed capital call.

To stop this vexatious and duplicative litigation, Plaintiffs were forced to file this action and seek this TRO enjoining Defendant[7] from further prosecuting the NCLT Petition, the Civil Lawsuit and any other foreign actions raising issues within the scope of the arbitration clause in the SHA.

## LEGAL ARGUMENTS

Federal Rule of Civil Procedure 65(b) allows this Court to issue a Temporary Restraining Order[8] to prevent irreparable harm.  *See* FED. R. CIV. P. 65(b).[9]  This includes an anti-suit

---

[7] Plaintiffs refer herein to Defendant and certain other Minority Shareholders of Continental who are also parties to the SHA, the Arbitration, and the Indian proceedings.  Plaintiffs do not seek to directly enjoin these other parties in this action because, to the best of Plaintiffs' knowledge, they are not subject to the jurisdiction of this Court.  Therefore, the request for relief herein is directed only at Defendant, and those entities he controls, because Defendant is subject to the jurisdiction of this Court.  Notably, the SHA specifically provides that the collective group of Minority Shareholders shall exercise their rights under the SHA *only* through Defendant.  *See* SHA § 21.1. In other words, Defendant controls the actions of all of the Minority Shareholders as they relate to the disputes with Plaintiffs.

[8] As indicated in the Complaint, Plaintiffs are willing to post a bond in an amount determined to be appropriate by the Court.  However, Plaintiffs respectfully submit that the Court should exercise its discretion to not require a bond here for this anti-suit TRO because there is no real risk of any harm to Defendant from being prevented from pursuing meritless foreign litigation in violation of an agreement to arbitrate he freely entered.  The Fifth Circuit has confirmed unambiguously that a court has the discretion to enter an anti-suit injunction without a bond.  *See Kaepa*, 76 F.3d at 628 ("In holding that the amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court,' we have ruled that the court 'may elect to require

injunction. "It is well-settled among the circuit courts—including [the Fifth Circuit]—which have reviewed the grant of an antisuit injunction that the federal courts have the power to enjoin persons subject to their jurisdiction from prosecuting foreign suits." *Kaepa*, 76 F.3d at 626; *see also Bethell v. Peace*, 441 F.2d 495, 498 (5th Cir. 1971); *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 431 (7th Cir. 1993) ("Courts of equity have long issued injunctions against the use of litigation, including litigation in foreign courts, not to obtain a decision on the merits but to harass a party.").

In considering such injunctions, "[t]he Fifth Circuit . . . weighs 'the need to prevent vexatious or oppressive litigation and to protect the court's jurisdiction against the need to defer to principles of international comity." *Commercializadora Portimex S.A. De Cv v. Zen-Noh Grain Corp.*, 373 F. Supp. 2d 645, 649 (E.D. La. 2005) (granting anti-suit injunction barring litigation in Mexico) (internal quotations and citations omitted). But because the Fifth Circuit, along with the Seventh and Ninth Circuits, follows the "liberal approach" to anti-suit injunctions, the weight given to comity, and thus the burden to obtain an anti-suit injunction, is considerably lower. *See, e.g.*, *Younis Brothers & Co., Inc. v. Cigna Worldwide Ins. Co.*, 167 F. Supp. 2d 743,

---

no security at all.' Thus, the district court did not violate Rule 65(c) by failing to compel Kaepa to post a bond.") (quoting *Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1978)).

[9] Because a foreign anti-suit injunction is a "particular subspecies of preliminary injunction," the Fifth Circuit has held that "the suitability of such relief ultimately depends on considerations unique to antisuit [sic] injunctions" and not the traditional factors for injunctive relief. *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 364 (5th Cir. 2003). Thus, courts granting an anti-suit injunction or TRO generally apply the specialized test discussed herein instead of the standard test for general injunctive relief. *See, e.g.*, *Kaepa*, 76 F.3d 624 (affirming anti-suit injunction without discussion of traditional injunctive relief factors); *InterDigital Tech. Corp. v. Pegatron Corp.*, 2015 U.S. Dist. LEXIS 85116, at *28 (N.D. Cal. June 29, 2015) (noting that "in each of the Ninth Circuit's recent anti-suit injunction decisions, the Ninth Circuit *only* addressed the three anti-suit injunction factors" in affirming anti-suit injunctions). Accordingly, this brief focuses on the anti-suit injunction test and not the general test for equitable relief. In any event, the general equitable relief factors would be satisfied were they to apply.

745 (E.D. Pa. 2001) (comparing the "liberal approach" adopted by the Fifth, Seventh and Ninth Circuits with the "restrictive approach" followed by the D.C., Second and Sixth Circuits).

Comity issues aside, "[a]n injunction against the prosecution of a foreign lawsuit may be appropriate when the foreign litigation would: (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's in rem or quasi in rem jurisdiction; or (4) cause prejudice or offend other equitable principles." *Zen-Noh Grain Corp.*, 373 F. Supp. 2d at 649 (citing *Kaepa*, 76 F.3d at 627 n.9 and *In re Unterweser Reederei*, 428 F.3d at 890); *see also, e.g.*, *Home Healthcare Aff. of Miss., Inc. v. N. Am. Indem. N.V.*, 2003 U.S. Dist. LEXIS 25118 (N.D. Miss. Aug. 8, 2003) (granting anti-suit injunction to stop duplicative litigation in Belgium).  Notably, this test is disjunctive—only one factor need be present to justify an anti-suit injunction.

The case for an anti-suit injunction is strengthened where, as here, "a party initiates foreign proceedings 'in an attempt to sidestep arbitration.'" *Laif X Sprl v. Axtel SA de C.V.*, 390 F.3d 194, 199 (2d Cir. 2004) (quoting *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 654 (2d Cir. 2004)).  Although it applied the more stringent Second Circuit test, *Amaprop Ltd. v. Indiabulls Fin. Servs.* is instructive.  *See* 2010 U.S. Dist. LEXIS 27117 (S.D.N.Y. March 23, 2010).  There, a dispute arose among a group of shareholders about their rights under a shareholders agreement containing an arbitration clause requiring the arbitration of all disputes.  *Id.* at *3–*4.  Plaintiffs commenced an international arbitration under the agreement.  *Id.* at *6.  Defendants made an initial appearance in the arbitration seeking additional time to answer, but agreed that they would still select an arbitrator.  *Id.*  Just before their answer was due in the arbitration, however, Defendants sought and received injunctions from Indian courts preventing the arbitration.  *Id.* at *8.  Plaintiffs filed an action in the Southern

District of New York seeking to compel arbitration and enjoin the Indian proceedings.  *Id.* at *8– *9.

      The court granted both motions.  First, it held that the dispute brought to the Indian courts was clearly within the scope of the arbitration clause of the shareholders agreement and thus compelled arbitration.  *Id.* at *13.  The court similarly granted the anti-suit injunction.  In so doing, it recognized that the parties were the same and resolving the anti-suit injunction issue was likely to resolve the foreign litigation that fell within the scope of the arbitration clause.  *Id.* at *15–*17.  The court next applied the multi-factor Second Circuit test and examined international comity.  Relevant here, the court found that the Indian proceedings "derailed the arbitration proceedings the parties agreed to in the Agreement and frustrated U.S. policy favoring enforcement of arbitration agreements."  *Id.* at *18–*19.  The court further found that the foreign proceedings were vexatious because Defendants agreed to cooperate in the arbitration, but then sought relief from the Indian courts that frustrated the arbitration.  *Id.* at *20.  Finally, the court concluded that the duplicative proceedings led to additional expense, delay, and a risk of potentially inconsistent judgments.  *Id.* at *22–*25.  Because the court found that these risks outweighed international comity concerns, it granted the anti-suit injunction.  *Id.* at *27.

      The *Indiabulls* court is far from alone in granting an anti-suit injunction to protect an arbitration from a duplicative foreign litigation.  Courts routinely do just that.  *See also, e.g.*, *InterDigital Tech. Corp. v. Pegatron Corp.*, 2015 U.S. Dist. LEXIS 85116 (N.D. Cal. June 29, 2015) (granting anti-suit injunction against foreign proceedings in favor of arbitration); *Storm LLC v. Telenor Mobile Commc'ns AS*, 2006 U.S. Dist. LEXIS 90978 (S.D.N.Y. Dec. 18, 2006) (same); *Newbridge Acquisition I v. Grupo Corvi*, 2003 U.S. Dist. LEXIS 55 (S.D.N.Y. Jan. 6, 2003) (same).

Defendant here should not be entitled to use the Indian judicial system to sidestep the arbitration to which he agreed. He should fare no better than the defendants in *Indiabulls* and the numerous other cases where attempts to frustrate arbitration through foreign lawsuits were enjoined. This Court, like many before it, should exercise its discretion to issue the anti-suit TRO.

## I.   The Indian Actions Frustrate the Strong U.S. Policy In Favor of Arbitration

Federal policy strongly favors the enforcement of arbitration agreements. *See, e.g.*, *AT&T Mobility LLC v. Concepción*, 563 U.S. 333, 346 (2011) ("[O]ur cases place it beyond dispute that the FAA was designed to promote arbitration. They have repeatedly described the Act as embodying a national policy favoring arbitration, and a liberal policy favoring arbitration agreements . . . .") (internal citations and quotations omitted); *Arcinaga v. Gen. Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006) ("[I]t is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy we have often and emphatically applied.") (internal citations and quotations omitted). This presumption in favor of arbitration "applies with particular force in international disputes." *Paramedics Electromedicina Comercial, Ltda.*, 369 F.3d at 655 (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 638–40 (1985)) (affirming grant of anti-suit injunction against foreign proceedings brought in violation of arbitration agreement and imposition of sanctions on party who failed to dismiss foreign action in favor of arbitration).

The disputes raised by Defendant and the other Minority Shareholders in the Indian actions interfere with this strong policy in favor of international arbitration by re-litigating the same issues in an improper forum. Indeed, one court granting an anti-suit injunction to protect a pending arbitration has noted that, even under the Second Circuit's higher standard, where there

are "[a]ttempts to interfere with arbitration of international disputes . . . little else is required to authorize an injunction." *Telenor*, 2006 U.S. Dist. LEXIS 90978, at *26.

Because the Indian proceedings interfere with the pending Arbitration, this factor is satisfied. This alone justifies the grant of the anti-suit TRO.

## II.  The Indian Actions are Oppressive and Vexatious

An anti-suit injunction is appropriate when "'allowing simultaneous prosecution of the same action in a foreign forum thousands of miles away would result in inequitable hardship and tend to frustrate and delay the speedy and efficient determination of the cause.'" *Kaepa*, 76 F.3d at 626–27 (quoting *In re Unterweser Reederei*, 428 F.2d at 890, 896). In considering whether foreign proceedings are vexatious or oppressive, the Fifth Circuit has examined the following interrelated factors: "(1) inequitable hardship resulting from the foreign suit; (2) the foreign suit's ability to frustrate and delay the speedy and efficient determination of the cause; and (3) the extent to which the foreign suit is duplicitous of the litigation in the United States [sought to be protected]" (or in this case, the arbitration). *Zen-Noh Grain*, 373 F. Supp. 2d at 649 (citing *Karaha Bodas*, 335 F.3d at 366); *see also Home Healthcare*, 2003 U.S. Dist. LEXIS 25118, at *7. Each of these factors is present here.

### a.  The Indian Lawsuits Cause Inequitable Hardship and Prejudice

Requiring litigation in India despite the arbitration agreement in the SHA is inequitable because it denies Plaintiffs the benefit of their bargain and subjects Plaintiffs to irreparable harm that can only be prevented by enforcing the arbitration clause. *See InterDigital*, 2015 U.S. Dist. LEXIS 85116, at *30–*31 ("the inability to enforce a valid forum selection clause constitutes irreparable harm . . . ."); *Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*, 652 F.2d 852, 855 (9th Cir. 1981) (quoting *In re Unterweser*, 428 F.2d at 896) ("allowing simultaneous

prosecution of the same action in a foreign forum thousands of miles away would result in 'inequitable hardship'"). Relatedly, the continuation of proceedings in India will further delay the speedy and efficient resolution of the Arbitration.

Finally, the Indian proceedings have caused and will continue to cause concrete harm to Continental and Gleneagles by delaying and frustrating the capital call from the 2017 Rights Issue that is necessary to ensure the continued operation of the company. Krishnan Decl. ¶ 19; Singh Decl. ¶ 12. Defendant has already once obtained an unwarranted injunction stopping the 2017 Rights Issue. Singh Decl. ¶ 10. And notwithstanding that this injunction was recently dissolved, the second capital call has not yet been consummated. Krishnan Decl. ¶ 18; Singh Decl. ¶ 11. This delay in critical funding has already caused significant harm to Plaintiffs. And if the Indian actions are allowed to continue, it is likely that Defendant will further delay the capital call and sorely needed funding with further meritless submissions. This is inequitable and irreparable harm that can be prevented only through the requested anti-suit TRO.

**b. The Indian Lawsuits Frustrate and Delay Speedy and Efficient Determination of This Dispute**

"Parties enter into binding arbitration clauses—particularly in the international setting— precisely in order to avoid . . . costs and inconvenience." *Indiabulls*, 2010 U.S. Dist. LEXIS 27117, at *24. The maintenance of foreign proceedings and Defendant's other efforts to impede the arbitration have already led to considerable delay and expense. Indeed, the Arbitration has been pending since January 2017 and the Tribunal still has not been constituted. Goyal Decl. ¶ 5. There is every reason to believe that Defendant and the other Minority Shareholders will continue to delay the Arbitration if not prevented from doing so.

Moreover, the multiple proceedings have and will continue to cause extreme inefficiency. Plaintiffs are now forced to litigate in multiple forums under different sets of laws and

procedures, notwithstanding the clear agreement to arbitrate in the SHA.  This has required the retention of counsel in India, in addition to arbitration counsel in Singapore and now counsel in the United States to seek this TRO.  This is a needless duplication of expense and resources that is sure to continue if Defendant is not enjoined from further Indian actions.

Finally, Plaintiffs are also at risk of contradictory rulings on the same issues from the Indian courts and the arbitration Tribunal (if Defendant stops his obstruction and it is ever constituted).  This Court, like the court in *Indiabulls*, should not hesitate to grant the anti-suit TRO to enjoin the Indian proceedings brought to frustrate the arbitration.  *See, e.g.*, *Indiabulls*, 2010 U.S. Dist. LEXIS 27117, at *20 (observing that party behaved in bad faith by seeking injunctive relief from Indian courts despite pending arbitration covering the disputes).

### c.   The Indian Lawsuits Are Duplicative of the Arbitration

There can be no debate that the Indian Lawsuits relate to precisely the same issues raised in the Arbitration and covered by the arbitration clause in the SHA—the procedures and rights related to a capital call under the SHA.  Indeed, the Indian court has already concluded as much, dismissing the NCLT proceedings and compelling arbitration.  In so doing, the Indian court was clear:

> In light of the above facts and circumstances of the case and law as discussed above, we are of the considered view that **the main issues raised in the Company petition [filed by Defendant and the other Minority Shareholders] arises primarily out of SHA dated 18th February 2015 which contains a valid arbitration clause** as discussed supra and all the remaining issues are either consequential/related/trivial issues, which are not required to be considered by this Tribunal and they would entirely depend upon adjudication of main issues arises out of alleged violations of clauses of SHA.  **As there is a valid, enforceable, undisputed SHA dated 18th February 2015 un-disputably exist between the parties, where an arbitration clause is available, it is mandatory for this Tribunal to refer the parties to Arbitration**

**under SIAC Rules**, and the parties are at liberty to file final claims/please before Singapore Arbitration Tribunal.

Singh Decl. ¶ 6 & Ex. A ¶ 23 (emphasis added).

There can be no better evidence of this issue of Indian law[10] (which governs the SHA), than the ruling of the NCLT Tribunal on this very issue.  Despite the clear ruling in India, Defendant persists nevertheless, including through an appeal of the finding that the arbitration clause in the SHA covers their claims.  Singh Decl. ¶ 4.  This Court should reach the same result as the NCLT Tribunal in India.  The claims raised in the Indian actions are covered by the arbitration agreement and because the Indian proceedings are therefore duplicative, an anti-suit injunction is justified.

## III.   An Anti-Suit Injunction Does Not Offend International Comity

As noted above, "the Fifth Circuit has rejected the approach taken by some other circuits, which 'elevates principles of international comity to the virtual exclusion of all other considerations.'"  *Zen-Noh Grain Corp.*, 373 F. Supp. 2d at 649 (quoting *Kaepa*, 76 F.3d at 627).  Thus, as explained by the leading Fifth Circuit case, the Fifth Circuit will not "require a district court to genuflect before a vague and omnipotent notion of comity every time that it must decide whether to enjoin a foreign action."  *Kaepa*, 76 F.3d at 627.  Comity is very rarely at issue where "no public international issue is implicated by the case."  *Id.*

That is precisely the case here.  Unlike cases where courts have placed greater weight on comity, there is no public international issue like the involvement of a foreign sovereign or possible disruption of an international treaty regime.  *Compare Karaha Bodas*, 335 F.3d at 372–74.  To the contrary, as in *Kaepa*, this is a "private party engaged in a contractual dispute with

---

[10] "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." FED. R. CIV. P. 44.1.  The ruling of an Indian court on the precise issue of foreign law before this Court certainly qualifies as competent evidence of foreign law under Rule 44.1.

another private party." *Kaepa*, 76 F.3d at 627; *see also Home Healthcare*, 2003 U.S. Dist. LEXIS 25118, at *8.  Thus, this Court, like the courts in *Kaepa* and *Home Healthcare*, should not hesitate to grant the ant-suit TRO to enjoin the Defendant's duplicative and vexatious foreign litigation.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Application for a Temporary Restraining Order restraining Defendant's foreign litigation and award them any and all further relief to which they are justly entitled.

Dated October 17, 2017

Respectfully submitted,

 _/s/ Mark D. Taylor_____ _____
Mark D. Taylor
State Bar No. 19713250
E-Mail: mark.taylor@bakermckenzie.com
Nicholas O. Kennedy
State Bar No. 24087841
E-Mail:
nicholas.kennedy@bakermckenzie.com

BAKER & MCKENZIE LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, TX  75201
Telephone: +1 214 978 3000
Facsimile: +1 214 978 3099

ATTORNEYS FOR PLAINTIFFS
GLENEAGLES DEVELOPMENT PTE
LTD and CONTINENTAL HOSPITALS
PRIVATE LIMITED